T.C. Memo. 2012-147

UNITED STATES TAX COURT

DIMITER HRISTOV AND TZONKA BAKALOVA-HRISTOV, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8899-10.                    Filed May 23, 2012.

<u>Michael Allen Lampert</u>, for petitioners.

<u>Anne M. Craig</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined that petitioners were liable for

accuracy-related penalties under section 6662(a) of $28,883, $27,972, and $28,571

for 2004, 2005, and 2006, respectively.[1]  The sole issue for decision is whether petitioners have established a reasonable cause and good faith defense to the section 6662(a) accuracy-related penalties.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulation of facts and the attached exhibits are incorporated herein by this reference.  Petitioners resided in West Palm Beach, Florida, when the petition was filed.

Petitioners' Backgrounds

Petitioners immigrated to the United States from Bulgaria in 1990.  Both are medical doctors.  Dr. Hristov was educated in Bulgaria, and that is where he received his medical training.  Dr. Hristov spoke English before immigrating to the United States, and while in Bulgaria he attended an English language high school.  Dr. Hristov practices medicine through his wholly owned S corporation, Dimiter B. Hristov, M.D., P.A.

From 1999 to 2008 enrolled agent Katherine Fallon prepared petitioners' Forms 1040, U.S. Individual Income Tax Return, as well as the Forms 1120S, U.S. Income Tax Return for an S Corporation, for Dr. Hristov's S corporation.  Ms.

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.  All amounts are rounded to the nearest dollar.

Fallon considered petitioners to be honest clients because she believed they never wanted her to stretch the rules and always gave her all of the information that she requested.

Adoption of the Retirement Plans

In early 2004 petitioners began looking for a way to increase their tax-deductible contributions towards their retirement savings.[2]  Dr. Hristov learned that William Alexander had established a pension plan for a colleague that allowed the colleague to put away "large amounts of money, invest in real estate to earn double or triple the returns, and get a portion of the pension fund back".  Shortly thereafter, Dr. Hristov and Mr. Alexander spoke on the phone about possible pension plans for petitioners.

Mr. Alexander told petitioners that they could make larger tax deductible contributions and reduce their tax liabilities by using a section 419 welfare benefit plan (419 plan) and a defined benefit plan (collectively, plans).[3]  Mr. Alexander provided petitioners with references and a business card that read "Pension

_____

[2]  Before 2004 petitioners saved for their retirement by making contributions to a simplified employee pension (SEP) plan.  Petitioners would contribute the maximum amount to the SEP plan each year.

[3]  We refer to the plans as a "419 plan" and a "defined benefit plan" for the sake of convenience and without attaching any legal significance to the titles.

Administration and Tax Planning". Dr. Hristov spoke with several of the references, and they were all "happy" with Mr. Alexander. Mr. Alexander also provided petitioners with a copy of a letter from the Internal Revenue Service (IRS) assigning him a centralized authorization file number, which authorized him to act on behalf of a taxpayer. Mr. Alexander told petitioners that he had successfully represented clients during audit, and he showed petitioners letters from the IRS regarding successful audits.

At Dr. Hristov's request, Ms. Fallon met with Mr. Alexander and petitioners. At the meeting Mr. Alexander explained the deductions in general but did not discuss the plans themselves or the details regarding the plans. Ms. Fallon informed petitioners that her experience with pension plans was limited to SEP plans and that she was unfamiliar with, and had never worked with, 419 plans or defined benefit plans. Ms. Fallon did not tell Dr. Hristov that he needed to retain an independent adviser regarding the plans, but she did tell him that he should continue to look into the plans.

Petitioners decided to hire Mr. Alexander to create and administer the plans. On April 30, 2004, Mr. Alexander sent petitioners a $2,500 invoice for the "idea of the plan, plan design and plan documents". In addition to the setup fee, Mr.

Alexander charged an annual fee of 8% of the total contributions petitioners made to the plans.[4]

The overall strategy was for petitioners to contribute money each year to a 419 plan and a defined benefit plan.[5] With respect to petitioners' 419 plan contributions, they would write a check to Lyons Pensions, Inc., in the amount of their 419 plan contribution. Mr. Alexander would then deposit $10,000 of the contribution as an annuity, take his 8% fee, and return the remaining money to petitioners as a "loan" from Lyons Pensions. Mr. Alexander told Dr. Hristov that the loan would never have to be repaid because the plan would eventually close and that petitioners were free to invest the returned money however they chose. For their defined benefit plan contributions, Mr. Alexander instructed petitioners to make a yearly deposit to a brokerage account. Petitioners opened a brokerage account at Oppenheimer Asset Management (Oppenheimer). When they opened the

---

[4] See infra pp. 7-9 for discussion of how Mr. Alexander received his 8% of the contributions to 419 plans. The record does not establish how Mr. Alexander received his 8% of the contributions to the defined benefit plan.

[5] Mr. Alexander suggested petitioners contribute between $250,000 and $300,000 to the plans: "With $400K of net income, I would probably put $250K to $300K into pension plans because this would get your income tax down by about $150,000."

account, petitioners gave the defined benefit plan documents to Oppenheimer.

Oppenheimer did not give petitioners an opinion that the plan was valid.

Petitioners' Tax Returns

For 2004, 2005, and 2006 Ms. Fallon prepared petitioners' Forms 1040 and

Dr. Hristov's S corporation's Forms 1120S. Each year petitioners would tell Ms.

Fallon the amounts they contributed to the 419 plan and defined benefit plan.[6]

Petitioners did not provide any documentation supporting the deductions, and Ms.

Fallon did not ask for it.

Defined Benefit Plan Contributions and Deductions

For the defined benefit plan Mr. Alexander recommended that petitioners

deposit $150,000 per year into the Oppenheimer account. In 2004 Dr. Hristov

contributed $150,000 and deducted $150,000 for pension, profit-sharing, etc., plans

expense on his S corporation's 2004 Form 1120S. Dr. Hristov also deducted

$150,000 for pension, profit-sharing, etc., plans expense on his S corporation's

2005 and 2006 Forms 1120S.[7]

---

[6] The specific deductions and the amounts of the deductions for each year are discussed below.

[7] The record does not address whether Dr. Hristov contributed $150,000 to the defined benefit plan in 2005 and 2006.

419 Plan Contributions and Deductions

On September 14, 2004, Dr. Hristov wrote a $250,000 check to Lyons Pensions for his contribution to the 419 plan. Mr. Alexander deposited $9,600 into an annuity with Great American Insurance and took his 8% fee. In early October 2004 petitioners received $220,000 from Lyons Pensions. Dr. Hristov's S corporation claimed a $250,000 deduction on line 18, employee benefit programs expense, on its 2004 Form 1120S. Petitioners did not report the $220,000 they had received from Lyons Pensions on either their Form 1040 or Dr. Hristov's S corporation's Form 1120S. Ms. Fallon did not become aware that petitioners had received money from Lyons Pensions in 2004 until petitioners' returns were audited in late 2007.

On September 5, 2005, Dr. Hristov wrote a check for $260,000 to Lyons Pensions for his 419 plan contribution. A few weeks later, Dr. Hristov received a check for $230,000 from Lyons Pensions. Mr. Alexander did not make a contribution to the annuity. Dr. Hristov questioned Mr. Alexander about the annuity, and Mr. Alexander explained that he had intended to make the deposit but had not.

While preparing petitioners' 2005 tax return, Ms. Fallon learned from Dr. Hristov that he had received $230,000 from Lyons Pensions in 2005.[8]  Ms. Fallon contacted Mr. Alexander about the returned money, and he told her that it was a rollover distribution.  On February 8, 2007, Mr. Alexander sent the following fax to Ms. Fallon:  "Report $250K paid back to Dimiter that he rolled over to other pension $.  Here's the 1099 for '05 that I filed.  Not filed for 04 nor 06."  The Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., issued by Lyons Pensions showed a $250,000 gross distribution and a $250,000 taxable amount.[9]  Mr. Alexander also faxed a sample Form 1040 showing Ms. Fallon how to report the distribution.  The sample showed $250,000 of pension and annuities income and zero taxable pension and annuities income.  Petitioners' 2005 Federal income tax return shows $250,000 of pension and annuities income and zero taxable pension and annuities income.  Dr. Hristov's S corporation claimed a deduction of $230,000 for an employee benefit programs expense on its 2005 Form 1120S.

---

[8]  Dr. Hristov did not tell Ms. Fallon that the $230,000 was used to purchase real estate.

[9]  The record does not explain why the Form 1099-R showed a $250,000 gross distribution when petitioners received $230,000 from Lyons Pensions.

On June 22, 2006, Dr. Hristov wrote a check to NB Services[10] for $250,000. In August 2006 Dr. Hristov received $240,000 from NB Services. Again, Dr. Hristov noticed that Mr. Alexander did not contribute $10,000 to the annuity, but he decided to not pursue it because he remained able to claim the full tax deduction. Dr. Hristov's S corporation claimed a deduction of $250,000 for an employee benefit programs expense on its 2006 Form 1120S. Petitioners did not report the $240,000 they received from NB Services on either their Form 1040 or Dr. Hristov's S corporation's Form 1120S. Ms. Fallon did not become aware that petitioners had received money from NB Services in 2006 until petitioners' returns were audited in late 2007.

Amended Returns

In addition to generating tax savings by adopting his retirement plans, Mr. Alexander told petitioners that they could receive a refund from the IRS by amending their 2002 Form 1040 and Dr. Hristov's S corporation's 2002 Form 1120S. Mr. Alexander explained that petitioners could get a refund by recharacterizing large purchases they made between January 1, 2002, and September 15, 2003, as contributions to a pension plan for the 2002 tax year. For

---

[10] Mr. Alexander instructed Dr. Hristov to make the check payable to NB Services instead of Lyons Pensions.

example, petitioners had purchased a rental triplex for $290,000 in 2003, and Mr. Alexander told them that they could arrange for that amount to be classified as a pension plan expense for 2002. Additionally, Mr. Alexander instructed petitioners to find checks for "down payments on property, checks to people, investment checks, big checks to buy certain things like antique furniture" written between January 1, 2002, and September 15, 2003. Petitioners gave checks to Mr. Alexander in August 2004.

In a November 18, 2004, letter Mr. Alexander explained to Dr. Hristov that his accounting partner, Kathy Medina, was amending the 2002 tax return for Dr. Hristov's S corporation to include a $270,000 pension contribution deduction, thus decreasing his corporate profit from $278,000 to $8,000. Mr. Alexander stated that this decrease in corporate profit would flow through to petitioners' 2002 Federal income tax return and would result in a $110,000 refund to petitioners. To come up with the contributions, Mr. Alexander told Dr. Hristov they could use the old checks that they had discussed.

In a December 1, 2004, letter Mr. Alexander discussed the refund process, stating that "I also think this amendment will move through easily without IRS even asking for copies of the checks because we are amending a K-1, but if I am wrong, and IRS asks for checks, we can come up with check[s]." Mr. Alexander assured

petitioners about the refund, telling them that "we are just asking for a refund so the worse thing that could happen is to be denied, but typically I get the refund although sometimes it takes a while".

On December 27, 2004, the IRS received the amended Form 1120S for Dr. Hristov's S corporation for 2002. On January 3, 2005, the IRS received an amended Form 1040 for Dr. Hristov for 2002. The return showed Dr. Hristov's filing status as single.[11] The amended return reflected the decrease in Dr. Hristov's S corporation's gross income, thereby decreasing petitioners' 2002 tax liability. Dr. Hristov requested a $98,819 refund. Even though the return was in only Dr. Hristov's name, both Dr. Hristov and Dr. Bakalova-Hristov signed it. The IRS did not issue a refund based on this amended return.

On June 6, 2005, the IRS received a second amended Form 1040 for 2002, this time with Dr. Hristov and Dr. Bakalova-Hristov filing jointly. This amended return also reflected the decrease in Dr. Hristov's S corporation's gross income, thereby decreasing petitioners' 2002 tax liability. Petitioners requested a refund of $104,259, and on August 8, 2005, the IRS issued the requested refund plus $12,082 of interest.

---

[11] Petitioners were married during 2002, and their filing status on the original return for 2002 was married filing jointly.

Mr. Alexander and Ms. Medina prepared petitioners' amended returns, and petitioners did not mention any of this to Ms. Fallon. The amended Form 1120S and the first amended Form 1040 both list Hal Richard as the return preparer. Petitioners did not know Hal Richard and assumed he was an associate of Mr. Alexander.[12] Mr. Alexander received 5% of the refund as his fee for preparing the amended return.

Audit

In late 2007 the IRS began auditing petitioners' returns, the plans, and the returns for Dr. Hristov's S corporation for tax years 2004, 2005, and 2006. Petitioners hired Mr. Alexander to represent them during the audit. Mr. Alexander assured petitioners that the deductions would be allowed. Mr. Alexander also stated that he was an enrolled agent, which petitioners later found to be untrue.

During the audit Dr. Hristov learned that Mr. Alexander had never filed the required Forms 5500, Annual Return/Report of Employee Benefit Plan. Additionally, at some point during the audit petitioners learned that Mr. Alexander was not responding to the auditor's requests for documents. Petitioners terminated

---

[12] In 2007 petitioners learned that Mr. Richard died in 2001 and thus had not prepared their amended returns. When Dr. Hristov subsequently questioned Mr. Alexander about Mr. Richard, Mr. Alexander explained that it was a clerical error and that petitioners did not need to be concerned.

their relationship with Mr. Alexander in February or March 2008. Petitioners then hired an enrolled agent to represent them during the audit and hired a pension plan administration firm to evaluate the defined benefit plan and to prepare the Forms 5500.

At the end of the audit petitioners agreed to a complete disallowance of all deductions for their 419 plan contributions and defined benefit plan contributions for 2004, 2005, and 2006. Petitioners agreed to increases in tax for 2004, 2005, and 2006 of $144,415, $139,862, and $142,855, respectively. Petitioners also agreed to return the refund they had received as a result of amending their 2002 tax return.

Mr. Alexander's Correspondence

Mr. Alexander had extensive correspondence with Dr. Hristov regarding the plans, Dr. Hristov's concerns about the plans, and Mr. Alexander's assurances that the plans were legal. Because the correspondence is relevant to whether petitioners had reasonable cause and acted in good faith, we include several excerpts from these letters.

Shortly after Mr. Alexander and Dr. Hristov were introduced, Mr. Alexander sent Dr. Hristov a letter on March 31, 2004, discussing the operation of the plans:

If I put $400K into the pension plans, you would have no tax, but obviously, you would have to borrow a lot of money from the pension plans, which my clients do as I promote this. Assets in the money purchase plan can be invested anywhere while I use fixed and variable annuities for the 419 plan, you really are not supposed to borrow money from the 419, but I'm aggressive so I have my clients do this * * *.

*   *   *   *   *   *   *

I am one of the best tax planners in the country primarily because I have worked with 8 or 10 of the sharpest and most aggressive CPAs in the country, I have seen how they basically control the amount of tax the clients pays by using these pension plans and corporations.

In an April 7, 2004, letter, Mr. Alexander discussed how lawyers and

accountants would not recommend the use of his pension plans:

With most doctors, they end up giving about half of their net income to the government for taxes, but you are very fortunate because I can use these pension plans and the corporations to shelter almost all of your net income to where you can control how much tax you pay.

What do most accountants and tax attorneys say about all of this?

Most would never advise you to put these plans together and do what I do because they don't understand and know about what I do.

Why?

By nature, it seems like U.S. accountants are conservative and backward people that are not creative. It's really easier for them just to have you pay a lot of tax.

I have been fortunate to work with ten of the sharpest and most aggressive accountants in the country, and I have basically copied their styles.

You have a lady accountant now, who is conservative and backward, but if she does what I tell her to do, you can keep her; otherwise, use one of my accountants * * *.

In a June 24, 2004, letter Mr. Alexander again discussed borrowing against the 419 plan: "You really are not supposed to borrow money from the annuity until the 419 plan has been terminated but I am aggressive so I let these clients withdraw money for [sic] the annuity, but it is best to leave the money in there for as long as possible, at least 30 days."

In an August 28, 2004, letter Mr. Alexander discussed the possibility of setting up similar pension plans for Dr. Hristov's colleagues:

I can also help your partner[s] * * * but they probably have CPAs that are conservative and strong with them and will try and talk them out of doing all this so if they need help, I could do the accounting, or get them a different accountant because the accountant list that I gave you has very strong accountants except they are aggressive business people and want the client to be able to have some options about saving income tax instead of giving 40% of the net income you have to the government.

In an October 27, 2004, letter Mr. Alexander responded to Dr. Hristov's concerns about the plans. Dr. Hristov had spoken with promoters of other pension plans who had indicated that the 419 plan was "dead". Dr. Hristov then contacted Mr. Alexander to see if there were any new developments regarding the 419 plan. Mr. Alexander assured Dr. Hristov that the 419 plan was legal and that the

promoters were just saying it was dead in attempts to sell their product. Mr.

Alexander also discussed the risk of audit in the letter:

> Then, even worse yet, when you talk to accountants, CPAs, and tax attorneys, they are extremely conservative about 99.5% of the time so all of those guys are going to tell you not to do anything and just pay the tax.
> I have never lost a big deduction for a 419 plan or a defined benefit plan.
> However, in the worse case scenario, if a deduction were disallowed, how much worse-off would you be than if you just paid the tax anyway like most CPAs have you do?
> Not much!
> Technically, we would have to fight to get penalties and interest dropped on taxes that you would owe, but you see this scenario and the option that I bring to you of being able to tax defer with these plans and actually even avoid tax with the right set of circumstances and steps.

In a December 1, 2004, letter Mr. Alexander again responded to Dr.

Hristov's concerns about the plans:

> You have people telling you all kinds of bad things about 419 plans.
> This happens all the time.
> I think it's probably better to keep it as confidential as possible about what you are doing * * *.
>
>     *    *    *    *    *    *    *
>
> Anything new on 419?
> No [sic] really.
> They are still legal and will stand up in an audit especially if I conduct the audit, but keep in mind, these rarely get audited, but these 419 plans are legal, and third-party loans are legal so in the very

remote possibility that you are ever audited on this, I would make the presentation in the audit as I would conduct the audit and sell the deductions.

You have to also keep in mind that typically IRS auditors aren't that bright plus almost none of them even know what 419 plans are.

Permanent Injunction Against Mr. Alexander

On April 12, 2011, the U.S. District Court for the Central District of California entered an order of permanent injunction against Mr. Alexander regarding his pension plan promotions. Specifically, Mr. Alexander was permanently enjoined from:

Providing any advice or assistance regarding the tax treatment of pension plans or welfare-benefit plans, including but not limited to:

* * * * * * *

iii. Advising any individuals or entities that they may contribute any amount of money to a defined-benefit pension plan or welfare-benefit plan without regard to actuarial limits or statutory limits;

iv. Advising any individuals or entities that they can use purported third-party loans to claim a deduction for purported contributions to a pension plan or welfare-benefit plan and still have access to that money;

v. Advising any individuals that personal expenses can be re-characterized as pension plan contributions * * *

OPINION

Respondent contends that petitioners are liable for the accuracy-related penalty under section 6662(a) for all three years at issue on alternative grounds:

(1) the underpayments of tax were attributable to negligence or disregard of rules or regulations under section 6662(b)(1); or (2) there were substantial understatements of income tax under section 6662(b)(2).

Section 6662(a) and (b)(1) authorizes the Commissioner to impose a 20% penalty on the portion of an underpayment of income tax attributable to negligence or disregard of rules or regulations. The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs. Disregard of rules or regulations is careless if "the taxpayer does not exercise reasonable diligence to determine the correctness of a return position" and is reckless if "the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe." Sec. 1.6662-3(b)(2), Income Tax Regs.; see also Neely v. Commissioner, 85 T.C. 934, 947 (1985) (stating that negligence is lack of due care or failure to do what a reasonable person would do under the circumstances).

Section 6662(a) and (b)(2) also authorizes the Commissioner to impose a 20% penalty if there is a substantial understatement of income tax.

"Understatement" means the excess of the amount of the tax required to be shown on the return over the amount of the tax imposed which is shown on the return, reduced by any rebate. Sec. 6662(d)(2)(A). A "substantial understatement" of income tax is defined as an understatement of tax that exceeds the greater of 10% of the tax required to be shown on the tax return or $5,000. Sec. 6662(d)(1)(A).

Respondent bears the burden of production with respect to petitioners' liability for the section 6662(a) penalty and must produce sufficient evidence indicating that it is appropriate to impose the penalty. See sec. 7491(c). Once respondent meets his burden of production, petitioners must come forward with persuasive evidence that respondent's determination is incorrect or that they had substantial authority, reasonable cause and good faith, or disclosure and reasonable basis for their position. See Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

Respondent has met his burden of production. Respondent established that the amounts of the understatements exceed the greater of 10% of the tax required to be shown on the return or $5,000. Because respondent has met his burden of production, petitioners must produce sufficient evidence to prove that respondent's determination is incorrect. See Higbee v. Commissioner, 116 T.C. at 446-447.

Petitioners argue that the reasonable cause exception under section 6664(c)(1) applies.

Section 6664(c)(1) provides an exception to the section 6662(a) accuracy-related penalty with respect to any portion of an underpayment if the taxpayer shows that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. The determination of reasonable cause and good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess the proper tax liability. Id. In order for the reasonable cause exception to apply, the taxpayer must prove that he exercised ordinary business care and prudence as to the disputed item. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Petitioners bear the burden of proving that they meet the requirements for relief under the section 6664(c)(1) reasonable cause exception. See Higbee v. Commissioner, 116 T.C. at 446-447.

Reliance upon the advice of a tax professional may establish reasonable cause and good faith for the purpose of avoiding liability for the section 6662(a) penalty. See United States v. Boyle, 469 U.S. 241, 250 (1985). Reliance on a tax professional is not an "absolute defense", but merely "a factor to be considered."

Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). Whether reasonable cause exists when a taxpayer has relied on a tax professional to prepare a return must be determined on the basis of all of the facts and circumstances. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98. The taxpayer claiming reliance on a tax professional must prove by a preponderance of evidence each prong of the following test: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Id. at 99. Reliance is unreasonable, however, if the adviser is a promoter of the transaction or suffers from "an inherent conflict of interest that the taxpayer knew or should have known about." Id. at 98.

## I. Reliance on Ms. Fallon

Petitioners argue that they should not be held liable for the section 6662(a) penalty for any year because they relied on their tax return preparer, Ms. Fallon. We analyze petitioners' claim using the three-prong test stated above. With regard to the first prong, petitioners have failed to establish that Ms. Fallon had sufficient expertise to justify reliance. "[R]eliance may not be reasonable or in good faith if the taxpayer knew, or reasonably should have known, that the advisor lacked

knowledge in the relevant aspects of Federal tax law." Sec. 1.6664-4(c)(1), Income Tax Regs. Ms. Fallon, although likely a competent tax return preparer, had no expertise with the 419 plan or the defined benefit plan. Ms. Fallon informed petitioners of her lack of knowledge regarding these pension plans, telling them that she did not have the experience to evaluate either the defined benefit plan or the 419 plan. Dr. Hristov testified that he was aware of Ms. Fallon's lack of knowledge regarding the plans.

Furthermore, with regard to the second prong, petitioners must establish that they provided necessary and accurate information with respect to all items reported on their tax returns, such that the incorrect returns resulted from errors on the part of the adviser. See, e.g., Westbrook v. Commissioner, 68 F.3d 868, 881 (5th Cir. 1995), aff'g T.C. Memo. 1993-634; Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978); Pessin v. Commissioner, 59 T.C. 473, 489 (1972). On the basis of the record, we conclude that petitioners did not provide Ms. Fallon with all the necessary and accurate information. While preparing the 2004 and 2006 tax returns, Ms. Fallon was unaware that petitioners had received money from Lyons Pensions and NB Services. Also, Ms. Fallon was unaware that the money petitioners had

received from Lyons Pensions in 2005 was used to purchase real estate and was not a rollover.[13]

Petitioners have failed to show that Ms. Fallon was competent to advise them on the plans or that they provided her all the necessary information. Thus, we find that petitioners have not established that their reliance on Ms. Fallon was justified.

## II. Reliance on Mr. Alexander

Petitioners also argue that they should not be held liable for the section 6662(a) penalty for any year because they relied on Mr. Alexander. Respondent argues that it was unreasonable for petitioners to rely on Mr. Alexander because he had a conflict of interest.

"A taxpayer is not reasonable * * * in relying on an advisor burdened with an inherent conflict of interest about which the taxpayer knew or should have known." Am. Boat Co., LLC v. United States, 583 F.3d 471, 481-482 (7th Cir. 2009) (citing Neonatology Assocs., P.A. v. Commissioner, 229 F.3d at 234; Chamberlin v. Commissioner, 66 F.3d 729, 732-733 (5th Cir. 1995), aff'g in part, rev'g in part T.C. Memo. 1994-228; Pasternak v. Commissioner, 990 F.2d 893, 902 (6th Cir.

---

[13] See supra p. 8, discussing Ms. Fallon's communication with Mr. Alexander regarding the money petitioners received from Lyons Pensions in 2005.

1993), aff'g Donahue v. Commissioner, T.C. Memo. 1991-181 and Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP, 623 F. Supp. 2d 504, 511 (S.D.N.Y. 2009)).

"[W]hen an adviser profits considerably from his participation in the tax shelter, such as where he is compensated through a percentage of the taxes actually sheltered, a taxpayer is much less reasonable in relying on any advice the adviser may provide." Am. Boat Co., LLC, 583 F.3d at 482. "'In order for reliance on professional tax advice to be reasonable * * * the advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment.'" New Phoenix Sunrise Corp. & Subs. v. Commissioner, 132 T.C. 161, 193 (2009) (quoting Mortensen v. Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), aff'g T.C. Memo. 2004-279), aff'd, 408 Fed. Appx. 908 (6th Cir. 2010).

Reliance on the professional advice of a tax shelter promoter is unreasonable when the advice would seem to a reasonable person to be "too good to be true". Edwards v. Commissioner, T.C. Memo. 2002-169 (citing Pasternak v. Commissioner, 990 F.2d at 903; Elliott v. Commissioner, 90 T.C. 960, 974 (1988), aff'd without published opinion, 899 F.2d 18 (9th Cir. 1990), and Gale v. Commissioner, T.C. Memo. 2002-54, aff'd, 119 Fed. Appx. 293 (D.C. Cir. 2005)).

Petitioners' reliance on Mr. Alexander was unreasonable because Mr. Alexander was a promoter and suffered from "an inherent conflict of interest that the taxpayer knew or should have known about." See Neontalogy Assocs., P.A. v. Commissioner, 115 T.C. at 98; see also Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121 (defining a promoter as "an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction"). Petitioners knew, or should have known, that any advice they received from Mr. Alexander was not independent because Mr. Alexander benefited financially from their using his plans. Mr. Alexander received a percentage each year based on the amounts petitioners contributed to both the 419 plan and the defined benefit plan. Petitioners knew Mr. Alexander profited only if they invested using his plans; thus, it was not reasonable for them to rely on his assurances that the plans were legal.

Additionally, it was unreasonable for petitioners to rely on Mr. Alexander because the advice would seem to a reasonable person to be "too good to be true". See Edwards v. Commissioner, T.C. Memo. 2002-169. Petitioners were told that they would receive back most of their contributions to the plans and that they were free to do with the money what they wanted. When Mr. Alexander discussed with petitioners how much they should contribute to the plans, he focused on how much

they would need to contribute to significantly lower their taxes, not on the statutory limits imposed on contributions to pension plans. At a minimum, Mr. Alexander's statements would cause a reasonable person to seek independent confirmation from a reliable and disinterested adviser familiar with 419 plans and defined benefit plans. See, e.g., Neonatology Assocs., P.A. v. Commissioner, 299 F.3d at 234 ("When * * * a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril.").

Mr. Alexander was a promoter and had a conflict of interest that petitioners knew or should have known about. Thus, it was not reasonable for petitioners to rely on Mr. Alexander.

III. Reasonable Cause and Good Faith

Even if we were able to find that petitioners relied on Ms. Fallon or Mr. Alexander, they would still not be able to show that they had reasonable cause and acted in good faith with respect to their understatements. See Freytag v. Commissioner, 89 T.C. at 888 (reliance on adviser is merely factor in considering whether taxpayer acted with reasonable cause and in good faith). Dr. Hristov argues that he acted with ordinary business care and prudence because he researched the plans and repeatedly questioned Mr. Alexander as to the legitimacy

of the plans. However, there were too many red flags concerning the plans for petitioners to reasonably believe Mr. Alexander's assurances that the plans were legal and the deductions valid. First, Mr. Alexander told petitioners that they were really not supposed to borrow from the 419 plan. Second, Mr. Alexander repeatedly stated that most accountants and tax lawyers would not recommend his plans. Third, Mr. Alexander told petitioners that they would have to change accountants if Ms. Fallon did not do what he told her to do. Fourth, Mr. Alexander told Dr. Hristov to keep what he was doing with the plans "confidential".

Petitioners have failed to establish that they meet the reasonable cause and good faith exception to the section 6662(a) accuracy-related penalty for any year in issue.

To reflect the foregoing,

Decision will be entered for respondent.