T.C. Memo. 2014-83

UNITED STATES TAX COURT

ISSACHAR OHANA AND RACHEL OHANA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 16014-11, 25896-11.          Filed May 8, 2014.

<u>Martin Aaron Shainbaum</u> and <u>Bryant W.H. Smith</u>, for petitioners.

<u>Jon D. Feldhammer</u>, <u>Thomas R. Thomas</u>, <u>Patricia A. Donahue</u>, and <u>Trent D. Usitalo</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Issachar and Rachel Ohana moved from Israel to Northern California in 2003.  Soon after, they bought two houses and from 2007 through 2009 poured money into them.  They claim deductions for the cost of these improvements, and argue that they were in the trade or business of real-

[*2] estate development, without ever having bought or sold any real estate during the years before us.  They did own the two properties, and they certainly improved them, and for part of that time even rented them out.  But did their activities amount to a trade or business?  If so, what were their deductible expenses?  Or is the Commissioner correct that their activity was only home improvement?

## FINDINGS OF FACT

Ohana[1] grew up in Israel and became a very educated man.  He earned his bachelor of science degree in electrical engineering and computer science.  He also obtained an MBA with a focus in marketing.  And since at least 1994, he's worked for CEVA, Inc.--a firm that develops and licenses digital-signal processor patents to computer-chip manufacturers.  Ohana tempered his high-tech endeavors with old-fashioned real-estate investments in Israel, where he owned and rented two properties.

But it was CEVA that was the focus of Ohana's attention.  After he'd worked there for ten years, the company was sufficiently impressed that it offered him a senior-executive position anywhere in the world--and Ohana chose the United States.  Two years later he became executive vice president of CEVA

---

[1] All references to Ohana in this opinion are to Issachar.  Mrs. Ohana's only activity in this matter was signing the joint tax return with her husband.

[*3] Global. His new position required constant travel and long and irregular hours. Those hours are irregular because part of his job is to attend meetings all over the world--often in exotic places like Hawaii or Morocco--for weeks at a time. Sometimes Ohana even had a chance to work out of Israel, which gave him an opportunity to visit family. His compensation, however, depended not on the number of hours worked, but on whether his team met certain quotas. And quotas they met: Ohana earned nearly $350,000 in both 2007 and 2008, and more than $550,000 even during the worst of the recession in 2009.

Ohana argues that despite his work for CEVA he was also able to find the time to run a real-estate business. Exactly how much time he spent on his real-estate activity between 2007 and 2009 is fuzzy though, since the only records Ohana kept were reconstructed logs that he pieced together from his Gmail account years later. At trial he referred to it as a "puzzle to put together." He said that he planned to make money by flipping houses--i.e., buying a house with the intent to fix it up and then sell it at a profit. Successfully flipping houses depends on several steps' being executed gracefully, from choosing where to buy (ideally in a neighborhood that attracts deep-pocketed customers) to choosing the right people to do the renovations to keeping transaction costs low. But if something goes wrong, such as trying to flip after a market crash, the flip can flop and the

**[*4]** flipper can be stuck with a piece of real estate. Ohana, however, claimed he had an "exit strategy:" He would move into the house and live there until the market was more favorable and then he'd try again to sell the property.

The Ohanas bought their first home in 2005 in Saratoga, California, a town on the edge of Silicon Valley. They bought the Saratoga home in their own names and personally held title to it. In 2006 Ohana sold one of his properties in Israel to fund his next acquisition, a house on Cowper Street in Palo Alto. Gregg Ann Herrern, a real estate agent, brokered the deal. Ohana intended from the get-go to tear down the Cowper Street home and build a new one, but at first he made only enough repairs to make the property livable. He quickly rented it out and left Herrern to manage the property, arrange for any necessary maintenance, and collect rent each month. Later on, when Ohana tried to evict his Cowper Street tenants, he emailed Herrern: "I told them from day one that I am going to build my house on this property."[2] In fact, that same day, he drafted an email for Herrern to deliver to the tenants saying the property "was purchased 2 years ago in order to build a new residence for my family."

---

[2] We observe that this email--and only this email--was missing from the production set of emails that the Ohanas provided to the IRS. The Commissioner got the email directly from Herrern.

**[*5]**  In 2007 Ohana began meeting with an architect and developing plans that included not only rebuilding the Cowper Street home, but also building a separate cottage unit that would function as a guest house and rental property.  The Cowper Cottage was eventually given its own address and rented out.  But on the record deed documenting the purchase, Ohana checked a box on the form that he intended to eventually make the Cowper Street home his primary residence.  He also emailed the chief building official of the City of Palo Alto that he had bought the property "to build my future home in Palo Alto."

At the beginning of 2008, however, the Ohanas were still living in their Saratoga home, which they began to remodel.  During that year, Ohana also began trying to get a construction loan to refinance his mortgages and fund the building of a new house and cottage on the Cowper Street property.  On this loan application Ohana again stated that he would use the money to build a primary residence, rather than invest in a business.  And that's just what he got--the loan papers show that he received a residential, not an investment, mortgage.  Ohana had by this time formed two limited-liability companies, Ohana Consulting LLC and Zoop LLC, but these neither held title to the two properties nor were the named borrowers for the mortgage and construction loans.  Indeed, throughout the three years before us, the Ohanas were the sole title holders and borrowers for

**[\*6]** both properties, even though the Ohanas reported on their tax returns that Ohana Consulting and Zoop owned both homes and incurred hundreds of thousands of dollars in expenses.

By the end of 2008 Ohana's general contractor had razed the home on the Cowper Street property and begun construction. There are a number of facts that strongly suggest Ohana intended the Cowper Street property to be his family's personal residence, starting with his decision to enroll his daughters in the Palo Alto school system for the 2008 and 2009 school years, before construction had even begun. And as soon as construction was completed (sometime in September 2009), the Ohanas moved in and began renting out the Saratoga home. The new Cowper Street home also had several quirks, such as a custom-built door with a peephole low enough that the five-foot-four Ohana could reach it. And Ohana obsessed over every detail of the project--he was very particular about materials, design, the interior decoration, and even which workers his contractor could use. He visited the property every day he was in Northern California and even had cameras installed so he could monitor the progress from afar. David Avny, his fellow Israeli friend and a CEVA co-worker, described Ohana as involved in everything, "not only in real estate. It's everything about him. He's very methodical."

**[*7]** Ohana's real-estate activity was not entirely limited to the two properties that he owned. In his free time he and Avny went around looking at multi-million-dollar properties in the area. He was on an email listserv that alerted him daily about properties in the area. And he spent a fair amount of time talking with Avny about potential acquisitions. But during the years we're looking at, this was the extent of his real-estate activity with Avny--just scoping out the market and strategizing late into the night about their possible future plans. Ohana nevertheless considered Avny a "partner" in his real-estate endeavors, even though they never went in together on a development project, and not once did they even buy a property through a partnership. Their relationship, we therefore find, was more of a friendship between two men who both dabbled in real estate, and not a partnership. And, of course, Ohana not only didn't sell or offer to sell either of the two properties that he did own, but he actually used both (albeit at different times) as his personal residences.

Ohana's scrupulous attention to detail in building his homes and working for CEVA did not carry over into his tax preparation. He says that he didn't read or even look at his 2007, 2008, or 2009 individual or partnership tax returns before signing and submitting them to the IRS. He didn't compare his Quickbooks accounting records to his tax return. And he didn't provide receipts

[*8] to the revenue agent during the examination to substantiate the business expenses claimed by Ohana Consulting and Zoop. Instead of checking his returns, Ohana relied on the tax-preparation skills of URS--an organization that specialized in pitching services to Israeli immigrants.[3] Many of URS's employees were Israelis who would spend most of the year back home and come back to the United States just before tax season. Ohana's friend Avny was cautious about using the firm, and he refused to allow anyone but the owner of URS, a man named Nadav, to do his taxes. Ohana was not as picky. His return preparer, Shalom Eyal Bitton, was neither an accountant nor a lawyer, though he was a former CFO of an Israeli company, and he came from an elite unit in the Israeli army--not particularly relevant experience when it came to tax preparation, but perhaps some indicator of trustworthiness to this particular expatriate community. Bitton assured Ohana that the software URS used should eliminate any concerns and would confine his role to data entry. As a bonus, Bitton promised that Nadav would review Ohana's returns. Ohana sent Bitton all the information related to his income and

---

[3] There are several cases pending in our Court naming URS as the tax preparer. A great many of URS's clients are being investigated by the IRS. Criminal charges have been filed against URS in the Central District of California on allegations that the firm deliberately aided, abetted, and assisted some of its clients in hiding money in Luxembourg after filing false tax returns. (We stress that Ohana is not one of these clients.)

[*9] deductions, including his real-estate activities, on documents entitled "Profit and Loss Details." URS then entered this data into a computer and generated a tax return.

Ohana's experience with URS was apparently typical--although a first-time taxpayer who used URS's services would undergo a two-to-three hour interview and hand over all his income and deduction information, later interaction was minimal. It is unclear from the record whether URS generally acted as a preparer that relied on its clients to characterize items of expense and income, or as a professional that advised its clients of the correct characterization of those items. But we do find that Ohana's dialogue with URS was limited, and that after his first conversation he went straight to a receptionist who already had his returns prepared. All a taxpayer like Ohana had to do then was cut a check and send the return to the IRS.

The Ohanas claimed deductions for nonrental business expenses and rental real-estate activity losses during 2007, 2008, and 2009 in the following amounts:[4]

---

[4] The Ohanas also claimed a long-term capital loss of $1,277 on their 2009 return as a result of not applying their long-term capital loss carryover from 2008 to their capital gains in 2009. But they failed to address this issue on brief, and we consider it abandoned for purposes of these cases.

**[*10]**

| Year | Nonrental | Rental |
|------|-----------|--------|
| 2007 | $96,780 | $138,874 |
| 2008 | 45,128 | 90,560 |
| 2009 | 145,472 | 55,492 |

The Commissioner issued notices of deficiency to the Ohanas for the 2007-2009 tax years in 2011. In them, the Commissioner determined that the Ohanas' rental real-estate losses were passive and also disallowed all of the Ohanas' claimed nonrental real-estate expenses. The notices disallowed the expenses of Ohana Consulting and Zoop, and asserted penalties, too. The Ohanas timely filed petitions to the Tax Court.

We tried the cases in California where the Ohanas live now, as they did when the cases began.

OPINION

A.  Deductibility of Expenses for Rental and Nonrental Activity

Taxpayers are generally allowed to deduct business and investment expenses under sections 162 and 212,[5] but section 469 puts strict limits on current

---

[5] All section references are to the Internal Revenue Code in effect for the tax years in issue. All Rule references are to the Tax Court Rules of Practice and

(continued...)

[*11] deductibility if a taxpayer incurs those expenses in a "passive activity." Sec. 469(a). The section 469 regulations make rental activities *per se* passive, unless the taxpayer engaging in them is a real-estate professional. Sec. 1.469-1T(e)(1)(i) and (ii), Income Tax Regs., 53 Fed. Reg. 5701 (Feb. 25, 1988); Hoskins v. Commissioner, T.C. Memo. 2013-36. Ohana conceded at trial that he was not a real-estate professional for the years at issue, and that "rental is not [his] main source of business," even though all his income during 2007-09 (aside from his CEVA paychecks) came from renting the Cowper and Saratoga properties. We therefore find that Ohana's rental income comes from a passive activity, which means that his rental expenses are deductible only to the extent of his passive income. Sec. 469(d)(1).

The deductibility of Ohana's nonrental expenses turns on whether they were personal or incurred in connection with a trade or business. See secs. 162(a), 262. Ohana testified that he planned to generate income not through renting his two houses, but by buying, improving, and then selling them at a profit.

But did his activity amount to being in a trade or business?

---

[5](...continued)
Procedure.

**[*12]** The definition of "trade or business" is not found in the Code, but the Supreme Court has provided us with the a well-known rule of thumb: to be engaged in a trade or business, a taxpayer must (1) be involved in the activity with continuity and regularity (2) the primary purpose of which is income or profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). We discuss each factor in turn.

**Continuity and Regularity**

Many witnesses credibly testified that Ohana was heavily involved in his real-estate projects.[6] But while Ohana may have been extremely involved in the remodeling and renovating of his homes, he was not "continuously or regularly" involved in the *business of buying and selling real estate*. During the years before us, he did not sell or buy a single property. And there is ample caselaw holding that taxpayers with significantly more nonrental real-estate activity than Ohana did not show the high frequency required to be considered regular and continuous. In Douglas v. Commissioner, T.C. Memo. 1998-165, aff'd, 181 F.3d 87 (4th Cir. 1999), for example, the taxpayer purchased eleven properties, renovated seven of them, and sold two before the tax years at issue. We held that even this was not

---

[6] The documentary evidence on which Ohana relies (e.g. binders and time logs) is not very probative as he put them together only for trial from approximations based on some of his emails and calendar.

[*13] enough to be considered regular and continuous because none of the sales occurred during the tax years before the Court. We similarly find that Ohana's two renovations without purchases or sales likewise is not a regular and continuous real-property development business. See also Wolfgram v. Commissioner, T.C. Memo. 2010-69 (intention to operate property as a bed and breakfast before operation began not regular or continuous activity); Finnegan v. Commissioner, T.C. Memo. 1997-486 (single venture not trade or business where speculative venture, no preexisting arrangement for transfer and no objective facts of intent to sell), aff'd, 168 F.3d 498 (9th Cir. 1999). And while we conclude that Ohana *intended* to eventually sell the Saratoga and Cowper Street homes, the only steps he took during the relevant tax years were in preparation to rent out the Saratoga home and in preparation to move into the Cowper Street home. Simply upgrading his homes with the desire to make a profit on a sale at some time in the future is not sufficient to meet the regular-and-continuous-activity test for a trade or business.

**Primary Purpose**

There is a second test that taxpayers must pass to show they were engaged in a trade or business, and that is proof that their primary purpose in engaging in the activity was for profit. The case here is affected by the fact that Ohana's

**[*14]** activities revolved around properties that either were or became his homes, and we need to figure out whether Ohana's expenses in improving these *personal residences* were in the pursuit of profit. See Newcombe v. Commissioner, 54 T.C. 1298 (1970) (explaining that facts and circumstances dictate whether a former residence used for personal purposes has been converted in the hands of the same taxpayer into property held for the production of income). We think not.

### 1. The Saratoga Home

We use five factors to determine whether an individual has converted his personal residence into property held for the production of income:

- the length of time the house was occupied by the individual as his home before placing it on the market for sale;

- whether the individual permanently abandoned all further personal use of the house;

- the character of the property;

- offers to rent; and

- offers to sell.

Grant v. Commissioner, 84 T.C. 809, 825 (1985), aff'd without published opinion, 800 F.2d 260 (4th Cir. 1986); Bolaris v. Commissioner, 81 T.C. 840 (1983), aff'd in part, rev'd in part on another issue, 776 F.2d 1428, 1433 (9th Cir. 1985). Grant sprang from an ugly divorce. After the taxpayer left the home, his estranged wife

**[*15]** rented out a portion of it, and in doing so assumed the responsibility of paying the maintenance expenses. The wife then left the house, followed several months later by the tenant. The taxpayer, faced with an empty house, personally took on the maintenance expenses to avoid problems with the insurance and utility companies while he tried to sell the house. He claimed a deduction for these expenses on the ground that he held the house for the production of income, since his ex-wife had converted the property into a rental property and he had never moved back in while trying to sell it. 84 T.C. at 824. But we concluded that he was not entitled to any deductions for two reasons: He never received any rent or participated in any way in his ex's rental activity, and there was no evidence that he was holding the empty home for appreciation in the short time between his regaining possession and its ultimate sale. Id. at 825-26.

Bolaris was a little bit different. In that case, the taxpayers had moved out of their old home and were trying to sell it. When they received no acceptable offers, they began to rent it out month to month while still trying to find a buyer. We denied them their claimed deductions for rental expenses because we thought

**[\*16]** it inconsistent with their simultaneous claim to nonrecognition of their gain under old section 1034.[7]  81 T.C. at 850.

The Ninth Circuit disagreed with our analysis and reasoned that renting a house at its fair market value showed that a taxpayer has a profit motive.  Id., 776 F.3d at 1433.  The Ohanas' situation is different from both of these--they lived in the Saratoga home until 2009, when they began to rent it out--but they never tried to sell it.  Ohana may have chosen to do this because of unfavorable market conditions, but Grant, Bolaris, and cases like them reasonably suggest that someone who argues that he's in the business of selling homes should show at least an attempt to sell one.[8]  And, in any event, Ohana unfortunately didn't record any of his expenses for the Saratoga home in his accounting records, so we'd have to deny his claimed deductions for lack of substantiation as well.

Because Ohana meets neither of the two requirements for characterizing his activities concerning his Saratoga home as a trade or business, we agree with the

---

[7] Before repeal, section 1034 allowed a taxpayer to completely defer recognition of gain on the sale of his principal residence, provided that (1) within two years before or two years after the sale he purchase a new residence and use it as his principal residence; and (2) the adjusted sale price of the old residence did not exceed the cost of the new residence.  See sec. 1034(a) and (b) (before the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 312(b), 111 Stat. at 839).

[8] Worse still, Ohana claims to have known full well that the market was about to crash and that he would be unable to sell at a profit.

[*17] Commissioner that the Ohanas can deduct no expenses other than mortgage interest and property taxes with respect to that property.  See secs. 163(h), 164.

### 2. The Cowper Street Property

Ohana argues that the expenses which he incurred in building the new Cowper Street home and cottage were not personal because he intended to make a profit on their eventual sale.  But as we said in Jasionowski v. Commissioner, 66 T.C. 312, 323 (1976) (citing Mel Dar Corp. v. Commissioner, 309 F.2d 525 (9th Cir. 1962), aff'g T.C. Memo. 1960-56), if hoping to eventually sell a house at a profit was by itself sufficient to establish a profitmaking intent, "rare indeed would be the homeowner who purchased a home several years ago who could not make the same claim."  The facts here, however, show that Ohana always intended to make the new Cowper Street property home his personal residence.  See Haddock v. Commissioner, T.C. Memo. 1986-476; Saunders v. Commissioner, T.C. Memo. 2002-143, aff'd, 75 Fed. Appx. 494 (6th Cir. 2003); cf. Russel v. Commissioner, T.C. Memo. 1982-709.  When he bought the home, he told third parties it was to be his primary residence.  The deed registration form he filed with the county said that he intended to make it his primary residence.  Even the email that he wrote to his real-estate agent said that he'd told his tenants "from day one that [he was] going to build [his] house on this property."  He had his agent draft an email to

[*18] those tenants bluntly stating that he would eventually oust them to build his "new residence." He also enrolled his children in the Palo Alto school system for the 2008 and 2009 school years--before the home was ready for him and his family to move into. His loans were of the sort one would get for a primary residence, instead of for a business or for an investment property. And there were even minor touches, like the personalized peephole, that made the home a bit less marketable for sale and a bit more useful for Ohana himself to use. All this leads us to find that he had an intent all along to re-root his family to Cowper Street. We find that Ohana, like many homeowners, worked on home-improvement projects with an eye to their effect on his property's value--but that doesn't mean that his activity was engaged in for profit.[9]

We therefore find that the Ohanas were not engaged in the trade or business of real-estate development from 2007 to 2009.[10]

---

[9] We likewise reject the Ohanas' alternative argument that their expenses are deductible as investment expenses under section 212. Section 469(c)(6), however, authorized regulations that to include such expenses within the definition of "trade or business" in applying the passive-activity loss rules. Section 1.469-4(b)(1)(ii), Inc. Tax Regs., was the response, and it requires us to combine Ohana's rental and nonrental real-estate expenses and then subject them to disallowance under section 469 as a consequence of his concession that he was not a real-estate professional.

[10] The parties skirmished on who should bear the burden of proof. This

(continued...)

**[*19]** B.    Effects

This finding has consequences for the rest of the Ohanas' case.  We cannot

allow a great many of their contested deductions because they are not connected to

a trade or business.  But there are other problems with them, to which we now

turn.  The Ohanas claimed deductible nonrental expenses on the tax returns they

filed for Ohana Consulting and Zoop--the partnerships[11] we've already found did

not own either of the two Ohana homes--for each year at issue.

---

[10](...continued)
fight is relevant only in the rare instances where there is an evidentiary tie.  See,
e.g., Dagres v. Commissioner, 136 T.C. 263, 279 (2011); Knudsen v.
Commissioner, 131 T.C. 185, 189 (2008).  And we do not need to resolve the issue
of who has the burden of proof if we find that the Commissioner proved his case
by a preponderance of the evidence.  See FRGC Inv., LLC v. Commissioner, 89
Fed. Appx. 656 (9th Cir. 2004), aff'g T.C. Memo. 2002-276.

[11] Ohana Consulting and Zoop were both LLCs with only two members (the
Ohanas).  Because the Ohanas didn't elect to treat them as corporations, both
LLCs are classified as partnerships under the Code.  See sec. 301.7701-3(b)(1)(i),
Proced. & Admin. Regs.

[*20]

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| Auto and truck expense | $10,242 | $13,541 | $8,938 |
| Meals and entertainment | 2,327 | 1,771 | 1,177 |
| Telephone | 1,332 | 1,327 | 2,380 |
| Travel | 14,305 | 10,860 | 12,950 |
| Total | 28,206 | 27,499 | 25,445 |

The only documents in evidence substantiating most of these expenses are Ohana's Quickbooks Profit and Loss Detail charts. But these are just summaries of his assertions, and a taxpayer's uncorroborated statements are generally not enough to support deductions for unsubstantiated amounts claimed. Mitchell v. Commissioner, T.C. Memo. 1996-217, see also Olive v. Commissioner, 139 T.C. 19, 32-33 (2012) (general ledgers by themselves are insufficient to substantiate a taxpayer's claimed deductions). But there was not even any evidence at trial to support any of the expenses the Ohanas claimed to have substantiated. There was nothing in the record to support the automobile and truck expenses claimed-- nothing in the logs to indicate how many miles were driven, and nothing describing the business purposes for the trips. See Pace v. Commissioner, T.C. Memo. 2010-272 (approximating petitioner's car expenses prohibited by section

**[*21]** 274's strict substantiation requirements). Indeed, aside from his business trips for CEVA, Ohana provided only two travel receipts: one for a stay in Morocco with his family made out to "Mr. and Mrs. Ohana," and another for his stay at the Disneyland Marriott--both of which he deducted as travel expenses. We disallow these as personal expenses.

Some of these expenses are deductible, albeit as personal expenses that the Code allows individuals to deduct, including their mortgage-interest expenses, state-income tax payments, and gifts to charity.

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| Home mortgage interest | $54,859 | $47,711 | $38,659 |
| State income taxes | 24,481 | 24,628 | 35,686 |
| Gifts to charity | 1,520 | 1,424 | 1,320 |

These are allowed.

We're left with what to do about the expenses incurred to renovate both the Saratoga and Cowper Properties. The Ohanas claimed the following deductions for these expenses on their partnership tax returns:

[*22]

|                   | 2007     | 2008    | 2009    |
|-------------------|----------|---------|---------|
| Tax and licenses  | $11,189  | $800    | $4,246  |
| Interest          | ---      | ---     | 72,701  |
| Insurance         | 256      | 3,593   | 617     |
| Outside services  | 44,478   | ---     | ---     |
| Utilities         | 859      | 1,566   | ---     |
| Total             | 56,782   | 5,959   | 77,564  |

Expenses related to real-estate activities are subject to the Code's capitalization rules. Section 263(a) prohibits a deduction for amounts paid for new buildings, permanent improvements, or betterments made to increase the value of any property or estate. The regulations add that nondeductible expenditures include amounts paid or incurred to add to the value or substantially prolong the useful life of property owned by the taxpayer, or to adapt the property to a new or different use. These rules apply to the new Cowper Street home because we find that Ohana built it for use as a personal residence.

Under section 1.263(a)-1(b), Income Tax Regs., these cost-capitalization rules also apply with respect to the production of real property for use in an activity conducted for profit, and require taxpayers to capitalize the direct and indirect costs of producing such real property. Sec. 263A(a)(1)(B); sec. 1.263A-

[*23] 1(e)(1) and (2), Income Tax Regs.  Section 263A(g) defines "producing" as constructing, building, installing, manufacturing, developing, or improving.  Sec. 1.263A-2(a)(1)(i), Income Tax Regs.  Likewise, section 263A requires the Ohanas to capitalize their direct and indirect costs related to building the Cowper Cottage because it was constructed for--and used as--a rental property.  These expenses include property taxes, outside services expenses such as the architect's fees, and expenses for licenses, insurance, and utilities directly benefiting or incurred by reason of the Cowper Cottage.  See Reichel v. Commissioner, 112 T.C. 14 (1999); Von Lusk v. Commissioner, 104 T.C. 207 (1995); Wilson v. Commissioner, T.C. Memo. 2002-61, aff'd, 71 Fed. Appx. 623 (9th Cir 2003); Tsakopoulos v. Commissioner, T.C. Memo. 2002-8, aff'd, 63 Fed. Appx. 400 (9th Cir. 2003).

The renovations of the Saratoga property are a hybrid:  Renovation expenses are properly capitalized under the rules of section 263(a) for the 2007 and 2008 years (while the Ohanas still lived there), and then under section 263A in 2009 once they moved into the Cowper Street home and held the Saratoga property as a rental.[12]

---

[12] The Court will enter decisions under Rule 155 in these cases; the parties should sort out these details of allocation in that process.

[*24] C.    Penalty

All that is left are the penalties.  A substantial underpayment exists if the understatement of tax exceeds the greater of 10 percent of the amount of tax required to be shown on the return or $5,000.  See sec. 6662(d)(1)(A).  The following chart illustrates the tax liability of the Ohanas based on their concession that they are not real-estate professionals:

|  | 2007 | 2008 | 2009 |
| --- | --- | --- | --- |
| Tax required to be shown | $54,297 | $55,658 | $115,398 |
| Less:  Tax on return | 12,524 | 27,230 | 95,972 |
| Understatement | 41,773 | 28,428 | 19,426 |
| 10% of Tax required to be shown | 5,429.70 | 5,565.80 | 11,539.80 |

The understatements for 2007, 2008, and 2009 exceed both 10 percent of the tax required to be shown and $5,000, based on this concession alone.  The Commissioner therefore meets his burden of production on the penalty with simple arithmetic.

The only issue left in dispute is whether Ohana has a section 6664 reasonable-cause-and-good-faith defense.  Sec. 6664(c)(1); sec. 1.6664-4(a),

**[\*25]** Income Tax Regs.  This requires us to look at the relevant facts and circumstances, including the taxpayer's efforts to assess his own proper tax liability, and, whether he had reasonable cause and showed good faith by relying on professional advice.

We must first decide whether Ohana received any advice at all from URS regarding his tax liabilities.  Section 1.6664-4(c)(2) of the regulation defines "advice" as a communication that reflects analysis and conclusions of the tax adviser.  See Woodsum v. Commissioner, 136 T.C. 585, 592-95 (2011) (advice reflects adviser's analysis or conclusion and taxpayer relied in good faith on adviser's judgment).  Ohana provided books and records to URS that stated he was in a real-estate trade or business.  The documents are entitled "Profit and Loss Detail" for each year at issue.  And while Ohana met with his tax preparer once during his initial interview with URS, his later meetings were with a receptionist who already had his returns prepared.  Ohana himself testified that URS performed mainly data entry into software that would generate a tax return.  And these advisers were neither lawyers nor accountants, as is plain from the obvious errors on the tax returns--for example, Ohana's rental property in Israel was completely omitted from his returns, even though income and expenses from those properties were included in his Quickbooks files.  In fact, his returns didn't line up with his

**[\*26]** accounting records at all. See <u>Catalano v. Commissioner</u>, 240 F.3d 842, 845 (9th Cir. 2001) (reliance on tax adviser's advice not reasonable where no evidence of adviser's professional qualifications or nature of advice received), <u>aff'g</u> T.C. Memo. 1998-447. This all leads us to conclude that he didn't receive "advice" from URS at all.

Even if we assume he did receive "advice" the caselaw lists three factors we need to look at to decide whether his reliance on it was reasonable. <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 99 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).

- First, was the adviser a competent professional who had sufficient expertise to justify reliance?

- Second, did the taxpayer provide necessary and accurate information to the adviser?

- Third, did the taxpayer actually rely in good faith on the adviser's judgment?

**Competent Professional**

We have already touched the first factor--URS was a group of mostly untrained individuals whose responsibilities involved rote data entry based on documents provided by their clients. The documents that Ohana gave them-- spreadsheets entitled Profit and Loss Details--bear a title that would likely lead a

[*27] number cruncher to assume Ohana was running a business. Still, we need to carefully focus on the main issue--whether Ohana reasonably knew or should have known that the tax preparer lacked knowledge in the relevant areas of tax law. Hristov v. Commissioner, T.C. Memo. 2012-147; sec. 1.6664-4(c)(1), Income Tax Regs. Ohana had a background in U.S. accounting principles as part of his MBA curriculum, but he was not sophisticated in tax matters by any means. His friend Avny didn't fully trust the URS preparers--he fired his original URS preparer and had the owner of URS, a CPA, sign his income-tax returns to ensure they were properly handled. But while Ohana was also skeptical, he still went through with it. He was assigned a preparer, Bitton, whom he knew was new to the job, and who had little-to-no background in tax preparation. He relied on Bitton's assurances that the software URS used was very sophisticated and would eliminate any of Ohana's concerns because Bitton's main role would be reduced to mere data entry. Reliance on tax-preparation software may not constitute reasonable cause for underreporting of income and corresponding underpayment of income tax. See, e.g., Bartlett v. Commissioner, T.C. Memo. 2012-254. Ohana, however, saves this part of his argument only because he was offered an added bonus: a promise that the CEO of URS would personally review Ohana's returns--and that CEO was a CPA, and a competent professional and owner of the tax-preparation

[*28] company--factors that we find are sufficient to lead Ohana to believe that URS had the requisite knowledge of tax law to prepare his returns. See Estate of Robinson v. Commissioner, T.C. Memo. 2010-168 (disbarred lawyer appeared competent).

**Necessary and Accurate Information**

The Ohanas, however, must also establish that they provided necessary and accurate information with respect to all items reported on their tax returns, so that the incorrect returns resulted from the adviser's own errors. Hristov, T.C. Memo. 2012-147; see also, e.g., Westbrook v. Commissioner, 68 F.3d 868, 881 (5th Cir. 1995), aff'g T.C. Memo. 1993-634; Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978); Pessin v. Commissioner, 59 T.C. 473, 489 (1972). Section 1.6664-4(c)(1)(i) of the regulation also requires a taxpayer to disclose all pertinent facts and circumstances that the taxpayer knows, or reasonably should know, to be relevant to the tax treatment of an item. See Diaz v. Commissioner, T.C. Memo. 2012-280.

There are problems here. Ohana testified that he had provided all of his real-estate emails to his attorney, who was then supposed to turn them over to the IRS, but we have found that he omitted the one least favorable email--the one in which he told his real-estate agent that he bought the Cowper Street property to

[*29] build a future home for his family. Ohana also testified that he managed all of his rental properties during 2007-09, but we've found that Herrern was the one who took the tenant applications, picked up their rent checks, handled maintenance requests, and mailed final notices of termination when the Ohanas decided to move in. This casts grave doubt about whether Ohana provided necessary and accurate information to URS, a doubt that becomes still graver because the documents that he gave to URS were estimated reconstructions-- unsupported by receipts--of what Ohana believed his income and expenses to be. And given the discrepancies between Ohana's Quickbooks logs and his tax returns, we find that Ohana did not furnish necessary and accurate information to URS.

**Actual Reliance in Good Faith**

The general rule is that a taxpayer can not avoid his duty to file accurate returns by placing the responsibility on an agent. Pritchett v. Commissioner, 63 T.C. 149, 174 (1974). It is not reasonable to fully rely on a professional simply because he is a return preparer. See Neonatology Assocs., 115 T.C. at 100 (the "mere fact that a CPA has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein"). And it is not sufficient that a taxpayer relied unconditionally on a preparer; the taxpayer must also exercise

[*30] "[d]iligence and prudence." Marine v. Commissioner, 92 T.C. 958, 993 (1989), aff'd without published opinion, 921 F.2d 280 (9th Cir.1991). As we said in Estate of Stiel v. Commissioner, T.C. Memo. 2009-278, taxpayers have a duty to read their returns to ensure that all income items are included. See also Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662–63 (1987) (reliance on preparer with complete information not reasonable cause where cursory review would have revealed errors); Magill v. Commissioner, 70 T.C. 465, 479-80 (1978) (taxpayer still has duty to read return to make sure all income included even if all data given to tax preparer), aff'd 651 F.2d 1233 (6th Cir. 1981). Given Ohana's unusually focused attention to detail in other areas of his life, we do not find him credible when he says that he never once looked at his tax returns. And that he kept accounting records but never once made sure they tied with his Forms 1040 or Forms 1065, U.S. Return of Partnership Income, is telling. Claiming reliance on a tax preparer and choosing to maintain ignorance of the contents of his returns is not reasonable reliance in good faith, and we will not permit Ohana to avoid accuracy-related penalties for substantially understating his tax liabilities.

While reliance on a professional tax preparer may save a taxpayer from accuracy-related penalties, it won't where an intelligent and skilled taxpayer

**[*31]** provided inaccurate information to the return preparer and claims improbably not even to have glanced at his returns to make sure they were satisfactorily prepared.

<u>Decisions will be entered under</u>

<u>Rule 155</u>.